and call our third case of this morning third and last case number 15-27 97 Constance versus Cosby. Mr. Gowan, Ms. Sproul Good morning and may it please the court. My name is George Gowan. I represent the appellant William H. Cosby. Let me ask you at the outset, what do you perceive is the strongest argument against your case? On the merits, your honor? No. What do you perceive is the strongest argument that your opposing counsel has? I think it's a tie, your honor. I think that the mootness argument is a strong argument. And I understand why it caught the court's particular attention. I also think that under the general pansy line of authority, there's a fair amount of discretion usually afforded to the district court. And that's a strong point for the other side to emphasize here. Why then in your opening brief, didn't you tackle head on, even with a sentence, the mootness argument, which as I understand it, if I recall correctly, was actually there was a motion after the appeal was filed that was referred to the merits panel. So you knew what was coming from your opposing counsel. In hearing your comment today, your honor, perhaps we misunderstood. My understanding was that the motion had been denied. And certainly when the AP raised the issue in opposition to our appeal, we stand ready to oppose it. Was the motion denied? Refresh my recollection. Was the motion denied or was it just referred to the merits panel? I think the language was denied or maybe dismissed. Perhaps we misunderstood what we should have done in our initial brief. So you came back and you replied. Yes, your honor. We did. We came back in the reply brief and essentially repeated the arguments that we had written in our opposition to the motion to dismiss the appeal. What can you help me with? What is meant by the word effectual as a modifier of relief? What does it take for the I mean, you know what it is you're asking for. That's the relief. But how do we gauge what is effectual relief? Well, I suppose, your honor, first of all, it doesn't mean entire relief and it doesn't mean whole relief. And in fact, in this setting, and I think consistent with what we've seen in cases, what we're really talking about, obviously we're not talking about money. We're not talking about a declaration. We're not talking about some kind of equitable relief. But in fact, what we're asking for, you're asking for is a kind of mitigation, isn't it? Your honor, that's exactly right. We recognize that harm has occurred for sure. But what we're asking for is for the court to enter an order that will narrow the further continuance of that. That's mitigating, right? I mean, that's that's one word for it. I agree. Okay. So to use either synonym, how can we grant any relief here that mitigates or narrows what has already occurred? In our discussions in my chambers, we have engaged in more metaphors, cat out of the bag, barn, you know, horse out the barn door, none of which have Putting the toothpaste back in the tube. Yeah, yeah, yeah, genie back in the bottle. None of them have been analytically terribly precise in terms of getting to where we need to get on this. Help me. I like the toothpaste metaphor, your honor, because unlike the cat coming out of the bag, which occurs in an instant, here, I don't think all the toothpaste is out of the tube, at least in so far as judicial documents go. What's happening is that window, the court window, it's metaphorical, but the window through which the public can access these judicial records tomorrow and the next day is continuing to let that toothpaste out of the tube. And while I agree it's a fine distinction, what I would do is draw your honor's attention to this court's decision in the United States versus Smith, where the court touched on this very distinction. Smith was a criminal case. In that case, the government produced a sentencing memorandum that included sensitive grantees. And the language you rely upon is not really directly addressing the mootness issue. The language in Smith? That case was not a mootness case, but it addressed the issue of whether something, whether the cat's been out of the bag justifies continuing sealing of court records. Isn't it fundamentally different, though, when we're dealing, first of all, with government there as the subject of the order, but secondly, it's grand jury material. It's material that inherently retains its statutorily protected, confidential nature. Part of what we're assessing here in evaluating mootness and whether there really is any meaningful relief is what injury has already been inflicted by the very widespread dissemination of this material. This is not 16 material, this is material that is capable of losing that protected status. Why hasn't that already happened? Well, your honor, again, I would draw us back to the analysis in Smith, which really was about dissemination. And there the court held that even though the media already had the very information that was subject to being sealed in the court's copy, a copy of that same information, the court said, that may be true. And I've got a quote here. But even if dissemination by members of the public continues, as the thing was talking about the media, the order barring further disclosure of secret grand jury material will at least narrow that dissemination. Now that may be an almost theoretical distinction, but for the court, it was a meaningful distinction. And I think it applies here in the jurisdiction. In this case, I mean, talking about theoretical, you have a decision that comes out on July 6th. The decision comes out, the document is free to go, the court reporter gives it to the New York Times, the Washington Post, AP, and a host of others. And then, right at that afternoon, you file a motion for stay. I mean, why didn't you file it for a stay, say to the judge, hey, look, if you rule against this, and we hope you don't, but if you do, we're asking for a stay because we're going to take an immediate appeal. Well, your honor, that was perhaps a strategy call that I can't delve too much into now. But it certainly wasn't for the purpose of mooting the appeal. But if that's the strategy, then why put me in the middle of the game? There's an old Bob Dylan song from 62, 63, only a pawn in the game. And I feel like I'm a pawn in this game. Well, and only you would remember a real old Bob Dylan. Bob Dylan, I do remember. Your honor, may I digress for a moment just to correct something factually? And it frankly is something that almost everyone who isn't me and about 10 other people would understandably misunderstand. The records that were unsealed in the case that we're reviewing here were discovery motions. They weren't a transcript of the deposition. It was discovery motions. And the discovery motions incorporated, in some cases attached, in some cases quoted, certain portions of a deposition. They were unsealed. And that's what we're appealing now. What happened some days later really is being litigated right now. The 900-page transcript is out there to many news organizations throughout the world. I don't concede that, your honor. I don't know exactly what that is. Well, we know the New York Times has it. We know the Washington Post has it. We know AP has it. I know that the New York Times has it. I wouldn't be surprised if other news organizations have it. But I do know that- that the magistrate judge said, or was conceded at the hearing, I guess, that they have it. And I come back to the toothpaste in the, you know, the tube. To me, it's even worse than that. It's like the toothpaste in the tube came out, people brushed their teeth, and they spit it down the drain. And you're asking us somehow to bring it all back. We can't do it. Well, your honor, I think, number one, the deposition transcript as a whole, again, that came from a different source. And it's my understanding that- The court reporting service. Yes. The court reporter, in the best case, mistakenly gave the entire transcript to, at least in my understanding, one news organization. That had nothing actually to do with what happened below. I think the court reporter- Well, but you're not asking us to muzzle the New York Times. So, I mean, don't you have to come in here and give us specific examples? Because I don't believe we're allowed to speculate. As to how we can go about narrowing, or mitigating, the use of whatever the matter is here that has been unsealed. Your honor, and I think the Smith court thought there was, and- Thought there was what? That there's a distinction between a judicial record and a newspaper account. Certainly, the law in many other contexts treats a public record, a judicial court record, differently than it does a newspaper. Don't we have to account, we live in an era where those same judicial papers that you're asking us to have resealed are themselves available, even with the court's legend over the internet. Under those circumstances, isn't the essence of your argument that there is sufficiently concrete risk that people are going to register and pay fees to get on Pacer to get those same documents rather than get them off the internet? A cause of continuing harm for you? What evidence is there that that's even an ongoing harm? And how could speculation about that seemingly unlikely possibility give us a live claim to review? Well, your honor, first of all, the documents, the unsealing creates the ability to get the documents in paper form, the old fashioned way for someone who doesn't have access to the internet, or chooses not to use the internet. But more importantly, for someone who doesn't believe everything they read. And rather wants to go to the source, wants to go to the courthouse to find out what the actual primary source of courthouse records, what the public, what the government says those records are. I think that's the difference. Is there anything in there in the record, any evidence that people have gone to get hard copies rather than get them over the internet? No, your honor, we don't have a record on the facts pertaining to mootness. I don't know. I don't know one way or the other. There's nothing in the record on that, for sure. How do you distinguish? Go ahead, finish, I'm sorry. Why would we change the subject a little bit? But we're talking about concrete examples. There is another example. And this hearkens to a different opinion of this hearken, that's in ray grand jury proceedings. The reality is that a reversal of the opinion below would restrict, change the ability of others to use these court records against the defendant in other proceedings. It does? It certainly enables the defendant to argue to those courts that... I mean, if we get a decision that says this is not moot, and we say that on the merits you win, what does that do to the Montgomery County case? What does that do to the District of Massachusetts civil case? Of course, we'll be speculating a bit because this hasn't happened yet. Isn't that, and that's the problem. We're speculating. They don't have to necessarily follow us. We can't control them. They don't have to follow the district court, for instance. Although I would note, and I'm not conceding this for any purposes, I'm sure someone's going to argue in some later sealing or protection case argument that there's a collateral estoppel effect. But in any event, what a reversal here would do would be allow the defendant to go in to those other proceedings and to say, they're trying to bring in under the guise of a judicial record, a document in this case that the Third Circuit has decided never should have been disseminated. But we have already said that speculation about what other courts would do that are not controlled, they're not within this circuit. When other courts are exercising their own independent discretion about questions like admission of evidence, that's not enough to give us a live claim. It's not enough to get over mootness. So is there anything that is pending in this circuit or any imminent prospect of further litigation, for example, like the Green case before Judge Brody, that would actually be controlled by a decision of this court? Well, Your Honor, again, I'm hesitant to continue to speculate, but either the harm has already occurred or it hasn't. And if it hasn't, it's to some degree speculative. So forgive the continued speculation. All right, but if you cannot posit specific instances of how this helps you, how this narrows, how it mitigates some wrong being done to your client, then how do we have anything other than mere relief that which you have requested, other than what we would be able to determine was effectual relief? I mean, we know what you want. You want a ceiling, or resealing. That seems to me not to be enough to answer the question of whether or not we have a moot claim here. Well, again, Your Honor, I would just draw us back to the Smith case, where the court found on identical facts, for analytical purposes, that it's not a moot issue, that it's not moot to seal the court records, even though the newspapers already have that same information. We highlighted for you in advance the orthopedic screws case, also precedent of the circuit. Can you address that and why that's not controlling? Sure, Your Honor. In orthopedic bone screw, the issue was one disclosure. In fact, it wasn't about court records at all. It wasn't about the unsealing or the sealing of court records. Bone screw was about one party's disclosure of another party's confidential information to a third party. The first party objected. But by the time the case got to this court on appeal, the disclosure had already occurred. This court noted that that bell, that one bell, the only bell at issue in the case, could not be unrung, and therefore found the case moot. Again, here, the court window is open today, and it can be closed tomorrow. But isn't the strongest evidence against you in this case is that when you filed last July, the motion for say, for whatever reason, strategic or tactical, after the order had already come out and the unsealing had taken place, you said that any appeal would be pointless if a stay was not granted. When I said it was pointless then, why is it not even more pointless today? Yes, Your Honor. And first of all, any motion to stay involves at least some partial acknowledgment that an appeal won't be able to provide full relief. And what we did there in our haste, and I agree it was hasty, is forget an adverb. And we forgot to wrote that it would be perhaps mostly pointless. And we can see that. A great deal of harm has occurred to defendant. That's why we, that's what we predicted that the district court would happen, and that's why we moved for a stay. But it doesn't mean that there's no effective relief available at this level. You made the point earlier that there's a distinction between the discovery motions that are at issue in this appeal and the actual transcript that was independently released. Yes, Your Honor. The independent release of that transcript is not before us, and that is now out in the public media. Correct? I don't know exactly what you mean. I think some media institutions have it. They have not made it available. They did briefly. It hasn't been, there's been no publication of any kind? There was briefly, and then when we pointed out the error or worse that it happened, my understanding is they stopped. By which you're referring to the means by which the matter was obtained, is that correct? Correct, Your Honor. And that's under litigation right now. But I think to answer Judge Krause's question, I think, and I tried this a few days ago, if you go online and try to get a copy of the deposition, you can't. At least I couldn't. So is it your representation to the court that the only way to see at this point an official, even excerpt of the transcript, is through these discovery motions? That the court reporter's version is not available anywhere publicly? That's my understanding, Your Honor. I mean, it's based on my personal use of the internet in preparation to answer that very question. To your knowledge, are there any current plaintiffs that have sued Mr. Cosby who do not already have copies of the documents in this case? I don't know what they have and what they don't, Your Honor. I would suspect that there are. Without some of these underlying facts, how can we make an informed decision about mootness? I can certainly supplement the record with whatever facts. Go to the next step. How can we possibly rule in your favor? I can certainly supplement the record with whatever facts on mootness. Is that the right step or do we simply then need to rule adverse to the party who has the burden on this issue? Your Honor, if you think that those facts are necessary for the determination of mootness, then of course you have a point. We don't and as our briefs suggest, we don't think that those facts determine the mootness issue. Our position is that both because a reversal below could affect the ability to use these documents in future court proceedings and because a judicial record is... The use of the word could inherently suggests speculation, right? For sure, Your Honor. The harm hasn't occurred yet and anything can change in the future, for sure. But I think we've talked a bit today about likelihoods. There's, in my view, once the trials begin, almost no chance that those judicial records won't be used as judicial records as opposed to newspaper articles in some fashion in those cases. I'm not the plaintiff in those cases. I can't control what they can do. I can predict what they're going to do and I would be surprised if they didn't. Let me just close with a Bob Dylan song. I was hoping Bob Dylan would come up. His voice is too raspy. From a practical perspective, if we dismiss the appeal as moot and vacate the district court's opinion, isn't that the best you can possibly hope for? I think a reversal is better, Your Honor. Reversal is better. It closes the court window. All right, but if that is the course we were to pursue, we determined that the controversy is moot and we then also vacate the district court opinion, where does that leave the district court order? Because we're not vacating an opinion, really. We're vacating a judgment. The opinion is going to go with it. But what's the effect of that? Because the order directs unsealing. So we're vacating an order that unseals. Now where's the district court and where are the parties? Well, Your Honor, I think it's really the clerk who has to interpret that. Yeah, he will. My interpretation would be the order that directed me to unseal these documents has been vacated and therefore they should be sealed. I think that would then lead to further proceedings in the district court. And if the clerk, pursuant to its own IOPs, that passage of time is consistent with what it previously did with respect to this record, sends notice to the parties, you would go in and seek once again to maintain the seal? Yes, Your Honor. Wouldn't the claim be moot as it is here? I think for the very reasons it's not, well, I hear what you're saying now. If the court determines that it's moot, yes, I think that's right, Your Honor. And then wouldn't the default under the local rule 5.1.5 be that it was unsealed? In other words, the clerk's procedure would just continue? The clerk's procedure is to revisit sealed documents within two years. That's essentially what happened here, albeit a little bit late. But it affords the parties objections, which then generates substantive proceedings like we had here. Is that your question? I think Judge Smith is saying if all that occurred, then the resolution would be that it's moot because it's really the same issue. Do you agree with that? It does make us right back to the same place. That is, that your objection, your efforts to keep the documents sealed in the district court would be moot. That was the import of my question. In that case, the documents would be unsealed and we'd be right back to the status quo. Your Honor, I agree that if this court finds that the issue is moot because the cat is out of the bag. Or the toothpaste is out of the bag. I think procedurally, there may be many steps, but we're going to wind up in the same place. Because there's been a substantive determination that because the cat is out of the bag, there's no sense in resealing the documents. So even if the district court has to go through the same rigmarole because it interprets a vacator of the order as requiring a resealing of the documents, we're going to eventually wind up in the same place. The fundamental point is we argue that it's not moot in the first place. And we agree that this court's determination of that is very important. It would be in the same place, but the district court's opinion and reasoning, including the pansy factors, which perhaps we'll talk to you about on rebuttal, would have been vacated. Correct? Correct. Thank you. We'll hear from Ms. Sproul. Good morning, Your Honors. May it please the Court. I'm Gail Sproul, and I represent the intervener appellee, the Associated Press. Your Honors, just to address a couple of the things that we just discussed with Mr. Gallin, you know, it is our view that, as you said in the orthopedic bone screw case, what's been done cannot be undone. And therefore, this matter is moot. I do want to say that the Isn't there an independent harm and something rather unseemly if it was an abuse of discretion to release these documents for the federal court to be in the position of continuing to release them? Why isn't that an ongoing injury, as your adversary has suggested? Well, a couple different responses to that, Your Honor. First of all, as you pointed out on Mr. Gallin's examination, Mr. Cosby did not seek a stay at any point. You know, he had the opportunity to do that. We had briefing. We had an oral argument. We had supplemental briefs. He never asked for that. But this doesn't involve procedures, as in bankruptcy, where there's built in an opportunity in advance to seek a stay. In the normal course in civil litigation like this, parties react. They're expected to react promptly. But surely reacting within a couple of hours is within the realm of a diligent counsel responding to a judge's order. I'm not suggesting that Mr. Cosby's counsel was not diligent. But unfortunately or fortunately, as Bob Dylan said, the times, they are changing. And that was also 63. In any event, not to be facetious, Your Honor, but the fact is that in a flash of a second, at the speed of light, we are notified of these things. We have to be on guard. You know, we all of us as lawyers have to be on our toes all the time to make sure that we're able to make some sort of showing on behalf of our clients. Isn't Mr. Gallin onto something, however, when he points us to the language from Smith? He has agreed with me, I think, that what he has to show for effectual relief here is some mitigation to the effects of the dispersion of these records and the information in it. And the Smith opinion uses the word narrow or narrowing. I mean, isn't that some pretty strong support for the positions? I don't believe it is here, Your Honor. First of all, in Smith, I'm sure you'll recall there's a little footnote about the sentencing memorandum which the press had been given and the court said, the press has it so we can't get it back from them and the public, therefore, has it. And so that's moved. That, I think, is what happened here. And I think narrowing or restricting or mitigating whatever verb you want to use doesn't apply here for two reasons. One, unlike a sentencing memorandum that might have been filed under seal or just given to the judge under seal. Unlike grand jury material, which, as Judge Krauss was saying, is inherently secret, which was obviously the issue in a grand jury case, this is a matter in which filed motions are at issue. Motions that were filed and they were put under, I might add, an interim seal. Judge Rebrano pointed that out in his opinion and he said, actually, right now, there is no seal. This was a temporary seal and nobody ended up coming back to me to seek a final seal because you guys settled the case. And so, you know, I never really made it final. In addition to that, we're talking about release to the public. And as Judge Krauss also said, there's a banner, you know, for the Pacer stamp is on these documents. They're out there. And to correct something that I heard earlier, excerpts of the deposition aren't publicly available. They're available from the news articles that were written about the release in this case. They're available from the news articles that were written and they were extensive in the New York Times, in the Washington Post, and I believe by the AP as well, quoting from, obviously, the most interesting parts, the most meaningful parts of Mr. Cosby's deposition. And in addition to that, the New York Times had a link to excerpts, extensive excerpts from his deposition. Counsel, the point that you make as to Smith and the footnote in Smith, doesn't that only drive home the point that has been made by your colleague on the other side of the aisle? That is, well, it may be moot as to your clients and others, other media's use of the material. It is a fundamentally different kind of injury when we're talking about continued dissemination of that same material by the government. I would say, Your Honor, that because what we're talking about here is material that has already been released to the public by the government, that there can be no equivalent of a future use injunction against the public. And that's what resealing, in this case, would do. But wasn't that the point of Smith? Wasn't that the narrowing went to the continued dissemination by the government, as distinct from and explicitly distinguished by the court from the dissemination by the newspapers or even an injunction as to the newspapers' use of it? I think that there what the court was doing was saying that it wasn't a PACER issue. It was, will the U.S. Attorney give this material out? Here we're talking about, you know, the actual release to the public directly. It has been released to the public directly. And this is, these are public documents. These are filed records. It should have been, I mean, actually, I think it's important to look at the history here. These documents were placed under seal, as I said, under an interim seal. The matter was settled and closed. Under Rule 5.15, there should have been a process implemented after two years for the district court to say to the parties to that case, we need to know whether or not you want to keep these documents under seal. That didn't happen. What is the meaningful distinction, though, between the, you know, the U.S. Attorney giving out a sentencing memorandum and the clerk of the district court giving out the motions here? I think because the U.S. Attorney had given it, the U.S. Attorney was the repository of the document. It wasn't the clerk's office. It wasn't on file publicly at the time. You know. But being in district court and the documents being sealed doesn't render them public documents. No, they, I mean, they were filed on the, they were filed, but they were filed under seal. These are court records. They were court records. And that's what PACER is about. But not all court records are made available to the public. That's true. Not right away. But I guess that's why I'm saying to the court, we can't divorce this from the history here, which is that for eight years, the documents remained under seal without any of the court's ordinary procedures taking place. You know, if this court were to vacate the judgment below or the decision below and reseal, in effect, the order, the motions at issue here, it would essentially be giving Mr. Khaji what he is seeking. It would be a reversal of Judge Rubrino's decision. Well, how so? Counsel just conceded on appeal that if it went that route, that their objections would be moot. Yeah, that's very interesting to me. And I'm glad he said that. But it does seem to me to be a completely circuitous way to reach a decision that this court could reach today by not vacating. There is under Bancorp discretion. That assumes they agree with you on the merits on pansy. No, no. Under Bancorp, Your Honor, if you decide that this is moot, there is discretion in this court to determine whether or not it will vacate or not vacate. Most signs point to vacater, though, don't they? From my perspective, there are signs pointing against it. But no, the question is most signs. I mean, last I can recall the decision that I wrote a few years ago at Lightner. I mean, the typical thing is that if you say it's moot, you vacate the decision. The ostensible reason for that is so that one side can't use that later on. I mean, you could argue that that's not great policy. But most courts, as a matter of course, vacate the decision unless there's some type of exceptional circumstance. I think that's true. And as Your Honor, Judge Ambrose said in the Old Bridge case, quoting the Bancorp Supreme Court decision, which was a contemporary of that decision, it's an equitable analysis. And there is discretion in this court as to what to do about that. There are two things that are at issue. There are two factors that, in our view, point in the direction of using that discretion not to vacate. One is the fact, as we've already discussed, that Mr. Cosby didn't seek to stay. But even more importantly in this case, from our perspective, is the public interest prong of that test. And by that— What do you mean by that? Well, what the court said in Bancorp was judicial precedents are presumptively correct, quoting now. They're, quote, valuable to the legal community, end quote, should stand unless a court concludes that the public interest would be served by vacating. What public— What public interest? I do want to get on to the pansy factors if we get to the merits. So what public interest is served by not vacating if we were to declare this case moot? I think the fact that this is— that what Judge Rubrino did in his decision was to finally address the Rule 5.15 analysis that was required and should have been done six years earlier. No fault of his. He obviously, when we asked him to do it, he did it. But in any event, that decision makes right or wrong. Something went wrong in the district court and, you know, we don't know what it was. But for whatever reason, the procedure was not implemented. It should have been implemented. He took it up. He made a very, you know, considered decision. One may not agree with it, but, you know, obviously we do. It seems that it would be inappropriate for this court to take away, to reseal something that should not— that should have been looked at at least six years before. And that was unsealed. We've actually come across no case in our research that shows where a purposely unsealed document has come up on appeal that it has been resealed after— I thought what you were going to say is within two years after it was initially sealed, there should have been a motion at that time to keep it under seal. Well, there should have been a motion at the conclusion of the case, Your Honor, because it was an interim seal, first of all. To make it a final seal. That wasn't done. That's number one. Number two, the way it works in the district court, this is something that I've dealt with myself where you get a notice from the court saying, by the way, we have these documents under seal that were sealed two years ago when you—when something—the case ended. What do you want to do about it? And then there's a response. Here, there was no notice from the clerk's office to the parties, so Mr. Cosby didn't make a motion. But later on, when the Associated Press became interested in this, we wrote to the clerk's office and asked them to implement Rule 5.15, which they then did. And that's when Mr. Cosby filed an objection, which is the way it's supposed to work. How does your argument that there is an ongoing public interest in the documents being unsealed square with your argument that all the damage has been done, that it is now moot? You can't have it both ways, can you? You know, I think that it's true that these documents will continue to be used. That's a fact. I assume that they will. But as Mr. Cosby has pointed out, this decision below is not precedential. He says that on page 6 of his reply brief, no court, as I think Your Honor pointed out, is obliged to follow Judge Rubino's decision. They can look at his reasoning, which is interesting, but they don't have to follow him. It's not precedential. So he can say, if he cites that opinion or someone cites it against him, he can say that the appeal, he appealed it, the appeal was dismissed as moot, which obviously doesn't mean it was upheld by this court. Let's go to the merits, if we may. If you get to the merits, the key issue is whether Mr. Cosby is a public figure who has reduced privacy interests in the contents of these documents. And we go back and take a look at our 1994 case in Pansy. Could you address the Pansy factors? One, let's just start with the first one. Will disclosure violate any privacy interests? I think what Judge Rubino did was to look at them together, Your Honor. He looked at the privacy interests along with legitimate public interest and also the legitimate purpose of the Associated Press in seeking access to this material. And in Pansy, the court said privacy interests are diminished when the party seeking protection is a public person. Well, it also said a public moralist. How does that reduce or narrow his interest in privacy? Well, I think that the way we need to look at it is that Judge Rubino analytically borrowed a concept from defamation and invasion of privacy law. But he certainly did not extract from Pansy the concept of public moralist, correct? No, no, he didn't. It is not stated in any way in the language of Pansy. That's true. But the court in Pansy was very clear, said, you know, we've got a test that this court itself said was, quote, unavoidably vague and that the factors were not exhaustive. It said its balancing test may be criticized as ambiguous and said then, concluded that it's necessary to provide the district courts the flexibility needed to justly and properly consider the factors of the case. So it's clear that in Pansy what this court was doing was setting up, you know, a rubric, a set of factors that the district court judges could use to apply to the facts in every case before them. But in context, the reference to... Susan, just add five more minutes, please. The reference to public person, doesn't that refer to public official? That's a reference to the specific Pansy factors to public officials and entities, right? I think within the Pansy case that's accurate. And those are the facts of Pansy as well. Yeah, and on one side you had the borough and on the other side you had a public employee. And that was what was before the court at that time. And that is what the court was talking about. Any application of Pansy factors or considerations as to a protective order and the privacy interests of an individual in connection with court discovery, have we ever suggested that there is, or any other circuit, that there is a reduced privacy interest because someone is a celebrity or because they're in the public eye? There isn't a case that says that, Your Honor. But I think it's the other side of the coin is why look at Pansy so restrictively? Why not allow the district court to take account of the facts before it, which is exactly the policy underlying the opinion in Pansy, which essentially is trying to give to the district judge the flexibility to deal with these facts. As I said, what the judge was doing and what Pansy does say is you can look at the legitimate public purpose and the public interest in assessing the privacy interest. But the district court's flexibility is not unbounded. It is not unbounded. We review for abuse of discretion. And we've outlined certain factors, none of which include whether someone has been a public figure or celebrity outside of being a public official, which has its own issues of public accountability associated with it. That's true. Yeah. In fact, isn't that an extension of Pansy, if we look at it that way? It's not because Pansy says our factors are not exhaustive. I mean, it seems to me what the court is trying to say when it says public official, and in that case, as you said, Judge Smith, that's who was in front of the court. You know, the court says not all of the factors we're going to mention here are going to apply in every case. And also, there may be factors that we haven't said. These are not exhaustive. That's also in Glenmead. These are, you know, there are facts that are inescapable. And what the judge was doing was saying at the argument, Judge Ubrino was discussing this. He said, you know, it does say public person, but it does seem to suggest that's a public official. Well, what do I do about all of the material that I know about Mr. Cosby? All of the stuff he's done, the books he's written, you know, the television programs he's produced, all of these things. But how do Mr. Cosby's comments on family life and child rearing have anything, literally anything, to do with the subjects that were dealt with in the deposition and the admissions that were made in that deposition? He also wrote about marriage. He wrote about courtship. He wrote about, and overall, he has been, we're not saying this is a bad thing, but he has been a person who has decided that one of the things he's going to do, and actually profit from because he's written books about it and he had a television show to this effect, is preach morality to a community. And he preached primarily to the African American community for decades. And for, you know, to use the term that we use in evidence, he essentially sort of opened the door to his own morality, which, as Judge Rubino said, is in stark contrast to the public persona that he has presented. All right, so I'm trying to figure out what that means and what that says. Is that some kind of descriptor of inconsistency or even, to use a stronger word, hypocrisy? I mean, is that what the legal standard is you're suggesting? Or, to put it another way, is that the legitimate public interest you're suggesting exists here, where someone is revealed to be a hypocrite? Well, hypocrite in the sense that basically he sold the public a bill of goods. You know, Mr. Cosby was preaching, you know, you've got to do this, you've got to do that, a high-minded person, this is where you have to live your life up here. Getting people to buy the books, getting people to watch the TV show, buy the products that are advertised on the TV show, and then, in fact, he's nothing of the kind. Is that an argument you actually made to the district court? Yes, it was made in the argument. And how does that fit in? I mean, that sounds like somebody sitting, you know, in their armchair watching television saying, wait a minute, wait a minute, this guy's a hypocrite. And how does that fit in legally within the Pansy factors? Well, as I said, Your Honor, the court says privacy interests are diminished when a party seeking protection is a public person subject to legitimate public scrutiny. So I would suggest that Mr. Cosby is a public person subject to legitimate public scrutiny because of his insertion of himself into this discussion, in fact, leading the discussion. And because in Pansy what the court has done is sort of meld these two concepts of legitimate public scrutiny and privacy. He talks about good morals with regard to family life, et cetera. This person has narrowed his ability to defend his privacy. Narrowed. It's not nonexistent, but he has diminished his zone of privacy. The consequences of that don't sound so good. The line drawing sounds to be extraordinarily difficult. Well, the judge was able to see what he said. He may have inserted himself into the public eye to espouse certain causes, but he's not the one who voluntarily brought himself into court. He was billed into court, right, as a defendant. Yes. And celebrities often are, sometimes with meritorious cases and sometimes without merit. How can it be that simply because someone has, you know, the lens of the public camera, that they speak out in favor of animal rights or the environment or against drug abuse, that as a result of that, if they are hauled into court and asked to defend themselves in civil litigation, that they have a diminished privacy in their personal life? I would say, Your Honor, just to use a hypothetical that Mr. Cosby used with respect to George Clooney, who was a well-known animal rights advocate and, you know, has publicly made statements about it. If he were sued for torturing an animal, which I'm sure would never be the case, but if he were sued for that and in his deposition had said, I did this, this is what I did, I think that would be a consideration. And I think what Judge Rubino was looking at here and what he said also at the argument was these are the defendant's own words. In his own words, he admitted that he did things that the plaintiff said he did. So is it only inconsistency and or hypocrisy, then, that somehow increases the public interest or the value to the public of this information? If a person, yes, I believe that is one factor. And again, Pansy is saying, you know, to the district court, think about what you have in front of you and how you can administer this test. But I would say, yes, that is a factor, especially if the person is profiting from their public position, which is what happened in this case. And again, as Judge Rubino said several times, in his own words, he's saying this. So it's not just the allegations of the plaintiff, Your Honor. It is true that he was sued and he's a defendant, but he then had his deposition taken and said what he has done. And that, and just small excerpts of those are what was at issue in the case. It sounds like you're tying that, though, to the public interest and not a per se reduced privacy on the part of public figures or celebrities. Well, I guess what I'm saying, yes, I agree that's what I'm doing. And the reason I'm doing that is because in Pansy, I believe as I've read the decision, that is what the court is permitted to do. Because it says privacy interests are diminished when the party seeking protection is a public person subject to legitimate public scrutiny. So the privacy interests shrink as the public interest grows. And I think that was the calculus that the Pansy court made. Thank you very much. Thank you. Thank you, Your Honors. I'd like to go back to Mootness and Vacator briefly and then touch on the merits if we have time. And this is almost just, almost an aside, but I know just sitting here listening to the argument, if this appeal is really Moot, why does the AP have standing to oppose it? Something's going to happen that the AP cares about if this case is overturned. The AP then goes on to say, and talking about the AP. My guess is their primary concern as a news organization is with First Amendment issues. They're probably concerned with the precedent, Your Honor. But interestingly enough, we're not allowed. Which is why they don't necessarily want the, if we declare this case to be Moot, they want us to exercise our discretion not to vacate the Judge Rubino's decision. Correct, Your Honor. And turning to that, the reason essentially they argue that should happen is because we didn't seek a stay. Now, as this court noted in Lightner, and that the Bancorp exception that the AP is referring to is very narrow. It's limited. Essentially, as Lightner recognizes, it's limited to where the parties settled the case after the district court determination, but before an appeal. And as this court has recognized, what that is, is essentially a voluntary forfeiture of the right to review. It's akin, as the court wrote in Lightner, it's akin to not appealing at all. Well, here, not moving for a stay, even if that's what occurred, we did move for a stay. Not moving for a stay is not akin to forfeiting. Well, not timely moving for a stay. Well, OK. I'll get to that in a second. Your point is that Bancorp is a narrow exception, and this doesn't fit within that. This is not a settlement. Certainly not on equitable grounds. The difference between moving for a stay just before a ruling or within hours after the ruling, for equitable reasons, shouldn't constitute a forfeiture of review to fit under the Bancorp exception. Why don't you turn to the pansy factors? OK. Specifically, can you address your adversary's argument that the decision below should be upheld because where there is hypocrisy that has been revealed as to a celebrity or someone in the public eye, that increases public interest, and that that necessarily has an effect on privacy, or at least in the gestalt balancing of the pansy factors? Why isn't that a basis to uphold the decision below? Well, on a lot of fronts, Jennifer. First of all, there's no basis for it in the law whatsoever. It's not in pansy. And in fact, not just in the facts of pansy, but also the citations and footnotes within pansy make it clear that that reduction of privacy refers to public persons, public in the governmental sense. So this is a completely new feature of law now that the district court has announced without any support. The only support that it did use was not even an analogy to defamation law, but a sound bite. It took a sound bite out of a defamation case and simply borrowed the public figure feature and inserted that into pansy, where heretofore pansy had only been about actual public. In addition to the public moralist theory, the district court reasoned that your client had injected himself into a public controversy by attacking the motives of his accusers. Why isn't that sufficient to reduce his privacy interest? Well, Your Honor, I mean, that really just goes to show the inapplicability of defamation law. In that case, almost every defamation defendant would have the same problem. And in fact, every defendant in court, in a sense, publicly denies the accusations lodged against him or her. The answer is public. So the mere fact that you contest the accusations shouldn't mean that you lose your privacy rights in discovery in that case. And if I could just take one more minute, something that hasn't come up in the discussion, something everyone knows about but pairs emphasis, the decision below was a balancing analysis at bottom. The court noted that several times. It's balancing, as my learned colleague noted, it's balancing the public interest versus the private interest. Let's not forget that these were not summary judgment motions. These were not trial transcripts. These are discovery motions. And this court has held there is no, at least no presumed right in the public to access those documents at all. Discovery is very traditionally private. Sometimes it's vile and therefore runs the risk of becoming public. But the courts noted several times that there is no public interest in those things. That had to have mattered in the balancing analysis below. It should have mattered. But you don't cite any authority to us on the confidentiality factor where anything akin to the information here, information about one's personal life, has been held under pansy, specifically confidentiality, to be sufficient to keep materials sealed. Those confidentiality cases seem to relate to medical records, protected third parties like victims, not the type of information you even have here. So when you're arguing privacy in this sense, it sounds like you're talking about the confidentiality of the information. But what authority is there that you rest on to say that that is sufficient to keep materials sealed? I'd have to turn back to the beginning, Your Honor. But the court conceded that it was private. And the AP conceded it was private. There was never any debate over whether the defendant's sex life, essentially, was private. I believe there is a case in our first brief. It's an old Supreme Court case that recognizes that that sort of information is about as private as it gets. Thank you, Your Honor. Thank you very much. Thank you to both counsel for well-presented arguments. And we'll take the matter under advisement and recess.